**IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

DEWAIN BOOGIE TROTTER,
DEMARCUS LACEY,
BRYCE BLEVINS,
BAILEY FISHER,
JOHANNA STROM,
PEYTON ILDERTON,
MEREDITH MAIER,
BLESSING KING,
PAIGE SIMPSON,
RYAN HOLMES,
HANNAH WYLER,
KSENIA MAMONTOVA,
ALLIE MARTIN, and
LEILA BOUSEDDRA,

Plaintiffs,

v. CIVIL ACTION NO. 3:26-0523

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant.

**MEMORANDUM OPINION AND ORDER**

On August 27, 2026, Plaintiffs filed a Motion for a Preliminary Injunction. ECF No. 11. The Court held a hearing on September 2, 2026, and denied the motion. The following Memorandum Opinion and Order explains the Court's decision.

**I.
BACKGROUND**

Plaintiffs are student-athletes at Marshall University (MU) and Ohio University (OU). Compl. ¶¶ 11–24, ECF No. 1. Each plaintiff graduated from high school in 2022, and each has played four seasons of a college sport. *See id.*

Defendant National Collegiate Athletic Association (NCAA) is an association of United States colleges and universities, including MU and OU. *Id.* ¶ 25. It "sets and enforces the rules of [athletic] eligibility and competition for its member institutions . . . ." *Id.*

Historically, the NCAA has limited student-athletes to participating in four seasons of college sports. *See id.* ¶ 26. Thus, "an athlete who first enrolled in college in . . . 2022 . . . and competed in every subsequent season would have exhausted four seasons of competition by the end of the 2026-27 season, as each Plaintiff in this action has." *Id.* ¶ 27. However, "[i]n response to the disruption caused by the COVID-19 pandemic, the NCAA extended an additional year of eligibility to student-athletes whose seasons were affected by the pandemic. Athletes who first enrolled in college between 2017 and 2020 were, in many cases, granted five or six seasons of intercollegiate competition." *Id.* ¶ 28. The NCAA recently made this rule permanent for "student-athletes graduating from high school in 2023 or later[.]" *Id.* ¶ 29. As a result, Plaintiffs, who graduated high school in 2022, may compete in college sports for only four years,[1] while their peers who graduated the following year may compete for five years. *See id.* ¶ 31.

Plaintiffs sued, alleging the NCAA's decision to limit their athletic eligibility to four years violates federal antitrust law, state contract and consumer-protection laws, and West Virginia and Ohio's "name, image, and likeness" statutes. *See id.* at 14–23. They ask the Court for a preliminary injunction requiring the NCAA to allow them to compete during the 2026–27 school year *Id*. ¶ 86. They also ask the Court to prohibit the NCAA from penalizing Plaintiffs, their coaches, MU, and OU for allowing Plaintiffs to compete.[2] *See id.*

---

[1]Three Plaintiffs graduated high school in 2022, but they also enrolled at MU in the spring of 2022. *Id.* ¶ 36. The NCAA has "not clarified whether it will treat" these Plaintiffs the same as those students who enrolled at MU in the fall of 2022. *Id.*

[2]"NCAA Bylaw 12.9.4.2 . . . authorizes the NCAA to impose penalties on member

## II.
## Preliminary Injunction Standard

"A preliminary injunction is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2948, p. 129 (2d ed. 1995)). To obtain a preliminary injunction, a plaintiff must establish: "(1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest." *Robinson v. NCAA*, 172 F.4th 271, 286 (4th Cir. 2026) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). "[*E*]*ach* of these four factors must be satisfied to obtain preliminary injunctive relief." *Henderson for NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018) (emphasis in original).

The "'standard of review is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature.'" *Robinson*, 172 F.4th at 286 (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). "Unlike prohibitory preliminary injunctions, mandatory preliminary injunctions alter, rather than preserve, the status quo and therefore are 'disfavored, and warranted only in the most extraordinary circumstances. '" *2311 Racing LLC v. NASCAR*, 139 F.4th 404, 408 (4th Cir. 2025) (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1999); internal citation omitted). Here, Plaintiffs ask the Court to alter the status quo by requiring the NCAA to deem Plaintiffs eligible to play college sports during the 2025–26 school year. *See Robinson*, 172 F.4th at 286. Plaintiffs therefore request a mandatory injunction, and their "showing of the requirements for relief must accordingly be indisputably clear." *Id.* (citation omitted).

---

institutions and coaches who permit an ineligible athlete to compete in reliance on a court order that is later modified, dissolved, or reversed." *Id.* ¶ 42.

## III.
## DISCUSSION

### A.
### Sherman Act Section 1

In Count I, Plaintiffs assert a claim for a violation of the Sherman Act. In relevant part, section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce* among the several States, or with foreign nations . . . ." 15 U.S.C. § 1, in part (emphasis added). In determining whether an agreement violates section 1, a court must first consider whether the agreement restrains trade or commerce. *See Robinson*, 172 F.4th at 287. It must then ask whether the restraint is "undue." *See id.* at 290; *see also Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) ("[T]he phrase 'restraint of trade' is best read to mean 'undue restraint.'" (quoting *Standard Oil Co. v. United States*, 221 U.S. 1, 59–60 (1911))).

"[T]here are three avenues of analysis under section 1 of the Sherman Act that apply depending on how obviously anticompetitive the challenged conduct is: (1) per se liability, (2) quick-look scrutiny, and (3) rule of reason analysis." *Robinson*, 172 F.4th at 290 (footnote omitted). As Plaintiffs acknowledge, the challenged NCAA decision is not per se unlawful. *See id.* at 290 n.10 (listing the types of per se-illegal restraints). Nor is it subject to "quick-look" review. "Quick-look analysis applies 'only for restraints at opposite ends of the competitive spectrum' where 'a quick look is sufficient for approval or condemnation.'" *Id.* at 291 (quoting *NCAA v. Alston*, 594 U.S. 69, 88 (2021)). It "should only be deployed when 'we have amassed considerable experience with the type of restraint at issue and can predict with confidence that it would be invalidated in all or almost all instances.'" *Id.* (quoting *Alston*, 594 U.S. at 89; quotation marks and citation in *Alston* omitted). In cases involving NCAA eligibility rules, a court only may apply

quick-look analysis "to benefit the NCAA," *id.*, and where "the rule 'is necessary to produce a game in the same way as rules about the number of the players on the field or playing time.'" *Id.* (quoting *Fourqurean v. NCAA*, 143 F.4th 859, 868 (7th Cir. 2025)). Here, the NCAA's decision not to extend Plaintiffs' eligibility is not "necessary to produce a game." Accordingly, the Court must analyze the decision under the "rule of reason."

Under the rule of reason:

> "[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." Should the plaintiff carry that burden, the burden then "shifts to the defendant to show a procompetitive rationale for the restraint." If the defendant can make that showing, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."

*Alston*, 594 U.S. at 96–97 (quoting *Am. Express*, 585 U.S. at 541–42).

Generally, before a court can assess whether the challenged restraint has a substantial anticompetitive effect, it "must first define the relevant market." *Robinson*, 172 F.4th at 292-293 (quoting *Am. Express*, 585 U.S. at 542). However, "plaintiffs challenging a 'horizontal restraint'—a restraint of trade among direct competitors—need not always define the relevant market to establish anticompetitive effects." *Id.* at 293 n.12 (citing *Am. Express*, 585 U.S. at 542 n.7). Plaintiffs can also establish a substantial anticompetitive effect "by otherwise demonstrating the horizontal restraints had an adverse effect on competition." *Id.*

**1.**
**Likelihood of Success on the Merits**

*i. Restraint on Commerce*

The parties dispute whether the challenged decision restrains "trade or commerce." *See* Compl. ¶ 5; NCAA's Resp. in Opp. to Pls.' Mot. for Prelim. Inj. at 1-2, ECF No. 12. The Court agrees with Plaintiffs. In *Robinson*, the Fourth Circuit concluded the NCAA's decision to count

junior-college seasons towards eligibility limits was "commercial and therefore subject to review under the Sherman Act." 172 F.4th at 280, 291. While the *Robinson* court declined to say whether all NCAA eligibility rules are commercial, *see id.* at 289 n.9, the court's reasoning applies to this case with equal force. College athletes can earn substantial compensation, either by entering revenue-sharing agreements or selling the rights to their name, image, and likeness (NIL). *See id.* at 289. Accordingly, by excluding Plaintiffs from eligibility to play for another season, the NCAA is limiting their "participation in a labor market." *Id.* Such a "restraint on labor . . . interferes with student athletes' free exercise of their rights to engage in commerce . . . ." *Id.* The challenged eligibility framework therefore restrains commerce.

*ii. Relevant Market*

Before the Court can assess substantial anticompetitive effect, the Court "must first define the relevant market." *Am. Express*, 585 U.S. at 542. Plaintiffs bear the "burden of proof to establish market definition" including the "relevant product and geographic markets." *Robinson*, 172 F.4th at 293-94. While the Fourth Circuit has declined to "specify[] the exact quantity of evidence required" by Plaintiffs to meet their burden of proof, they must present "factual evidence." *Id.* at 294-95. After all, market definition "is essentially a question of fact." *Id.* at 293. The Court must then "make factual findings regarding the market." *Id.* at 294. The Court must also make "a fact-specific analysis of the relevant market," especially where the parties disagree. *Id.*

*a. Definition*

Plaintiffs here have defined the "relevant markets" as the "sport-specific Division I labor markets" in which each Plaintiff competes or seeks to compete. Compl. ¶ 50; ECF No. 11, Pls.' Mot. for Prelim. Inj. at 7. This definition encapsulates the "product market"—labor and the "geographic market"—the United States, for each specific Division I sport. *See Wisne v. NCAA*,

No. 1:26-CV-03063-CNS-KAS, 2026 WL 2214234, at *14 (D. Colo. July 31, 2026), *opinion clarified*, No. 1:26-CV-03063-CNS-KAS, 2026 WL 2214320 (D. Colo. Aug. 2, 2026); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 n.3 (4th Cir. 2011) (The Supreme Court has recognized that "[t]he criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market.") (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962)).

The NCAA's claim that Plaintiffs have not proffered a "single piece of evidence" to support their market definition is an exaggeration. NCAA's Resp. in Opp. to Pls.' Mot. for Prelim. Inj. at 8. Plaintiffs first assert that sport-specific Division I labor markets "have been recognized as relevant antitrust markets." Pls.' Mot. for Prelim. Inj. at 11 (citing *Ohio v. NCAA*, 706 F. Supp. 3d 583, 591-92 (N.D. W. Va. 2023) (holding that NCAA bylaws are "essentially horizontal agreements among competitors that compete in the same sport-specific markets within NCAA Division I")). Plaintiffs also assert that "[s]ports economists have similarly concluded that Division I athletics constitute 'a unique labor market' over which 'NCAA has clear monopsonistic control.'" *Id.* (citing *Wisne v. NCAA*, No. 1:26-cv-03063-CNS-KAS, Pls.' Mot. for TRO or Prelim. Inj. at 13 (D. Colo. July 15, 2026) (quoting declaration of sports economist Dr. David Berri)).

Plaintiffs cannot rely on the market definition put forward in *Ohio v. NCAA*. The Court's fact-specific analysis of market definition "cannot rely on market definitions accepted on different evidence and in a different posture." *Robinson*, 172 F.4th at 294 (quoting *Elad v. Nat'l Collegiate Athletic Ass'n*, 160 F.4th 407, 417 (3d Cir. 2025)). The lower court in *Robinson* also relied on *Ohio v. NCAA*, among other decisions, for its market definition. *See Robinson v. Nat'l Collegiate Athletic Ass'n*, 803 F. Supp. 3d 481, 499 (N.D. W. Va. 2025), *vacated and remanded*, 172 F.4th 271 (4th Cir. 2026). However, the Fourth Circuit held that the lower court "failed to properly

define the relevant market," where it relied "on the market definition used in *Alston*" and, presumably, the other market definitions it cited. *Robinson*, 172 F.4th at 293.

However, Plaintiffs may rely on Dr. Berri's declaration put forward in *Wisne v. NCAA* to the extent it is applicable. The Fourth Circuit in *Robinson* held that the lower court "failed to properly define the relevant market," where it relied "on an expert report submitted in a different case . . . where that expert, in turn, relied on another case." *Robinson*, 172 F.4th at 293. Yet, Dr. Berri's declaration in *Wisne* relies not on past legal opinions, but on factual evidence. *See* Berri Decl. Ex. 5 to Pls.' Mot. for Prelim. Inj., ECF No. 11-5, at 38-61; *see also Wisne*, 2026 WL 2214234, at *14 ("Dr. Berri put forth evidence from which he drew his own conclusions, which themselves serve as market definition evidence."). Moreover, there is no indication on the record that market realities have substantially changed since Dr. Berri's declaration was made. *See Alston*, 594 U.S. at 93 ("Whether an antitrust violation exists necessarily depends on a careful analysis of market realities . . . . If those market realities change, so may the legal analysis.").[3]

The district court in *Wisne* found that its plaintiffs "met their *market definition* burden" based on Dr. Berri's evidence. *Id.* at *15 (emphasis original). However, Plaintiffs' market definition here is distinct from the plaintiffs in *Wisne*. The plaintiffs in *Wisne* defined the relevant market as the entire "labor market for Division I college athletics." *Wisne*, 2026 WL 2214234, at *10. Here, Plaintiffs define the relevant markets as the "sport-specific Division I labor markets" in which each Plaintiff competes or seeks to compete. Compl. ¶ 50; Pls.' Mot. for Prelim. Inj. at 7. While similar, there are key differences. For example, the market definition asserted in *Wisne*

[3]The preliminary injunction in *Wisne* was stayed by the Tenth Circuit pending appeal. *See Wisne v. NCAA*, 26-139 (10th Cir. Aug. 21, 2026) (granting stay).

would include Division I wrestling, but the market definition here would not, as no Plaintiff here "competes or seeks to compete" in Division I wrestling. *See* Compl. ¶ 50. [4]

*b. Analysis*

The Court's fact-specific analysis is guided by whether Plaintiffs defined their proposed relevant markets "with reference to the rule of reasonable interchangeability and cross-elasticity of demand[]" or whether they alleged proposed relevant markets "that clearly [do] not encompass all interchangeable substitute products." *Id.* at 294 (quoting *Queen City Pizza, Inc. v. Domino's Pizza*, *Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)). "The relevant market is defined as 'the area of effective competition,' meaning 'the area within which significant substitution in consumption or production occurs.'" *Robinson*, 172 F.4th at 293 (internal citation omitted) (quoting *Am. Express*, 585 U.S. at 543). "In the labor market context, the market is comprised of those employers seen by workers as reasonably good substitutes." *Id.* (citing *Fourqurean v. NCAA*, 143 F.4th 859, 869 (7th Cir. 2025) (citing *Todd v. Exxon Corp.,* 275 F.3d 191, 202 (2d Cir. 2001) (Sotomayor, J.))).

Plaintiffs allege that the NCAA's members "collectively enjoy monopsony power." Compl. ¶ 48 (quoting *Alston*, 594 U.S. at 90). In the context of a monopsony, "the market is not the market of competing sellers but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes." *Todd*, 275 F.3d at 202 (quoting Roger D. Blair & Jeffrey L. Harrison, *Antitrust Policy and Monopsony,* 76 Cornell L.Rev. 297, 324 (1991)). Hence, the proper focus of the Court's factual analysis is "the commonality and interchangeability of the buyers, not the commonality or interchangeability of the sellers." *Id.*

[4]Plaintiffs have listed included relevant markets "without limitation." Compl. ¶ 50. To the extent Plaintiffs compete or seek to compete in other markets not listed, they have not offered any supporting evidence.

Thus, the question presented is not the interchangeability of student-athletes, but the interchangeability, from the perspective of student-athletes, of potential employers. *See id.*

Upon review, the Court does not find sufficient evidence to define any of the Division I sport-specific markets listed by Plaintiffs. *See* Compl. ¶ 50. Here, Dr. Berri's analysis combined all Division I sports into a single market. Berri Decl. Ex. 5 ¶ 21. He did not purport that his data, analysis, or conclusions were sufficient to define any of the underlying sport-specific markets or to support a factual basis for Plaintiffs' claims. *See id.* at 1-24.

Dr. Berri's declaration may provide enough evidence to define the Division I football market in relation to collegiate alternatives, based on revenue and attendance data. Berri Decl. Ex. 5, at 8-10, 12; *see Wisne*, 2026 WL 2214234, at *15 ("Dr. Berri identified evidence that may be considered in any *market definition* analysis, including revenue and attendance data.") (emphasis original; citing *Int'l Boxing Club of N. Y., Inc. v. United States*, 358 U.S. 242, 250-51 (1959)). However, the declaration does not address the interchangeability of Division I football teams with professional football teams. Berri Decl. Ex. 5, ¶¶ 33-65; *see Robinson*, 172 F.4th at 295 n.15 ("Do NCAA Division I football teams compete with NFL teams for players post-*Alston*?").

Conversely, Dr. Berri's declaration addresses the interchangeability of professional sports leagues for college baseball, women's basketball, softball, women's track, and women's cross country; but fails to address the interchangeability between Divisions. Berri Decl. Ex. 5, ¶¶ 62-64; *see Robinson*, 172 F.4th at 295 n.15 ("Are players from Division II and III schools reasonable substitutes, such that these schools should be part of the market definition?").[5]

---

[5] In the context of a monopsony, the more appropriate inquiry may be: Are Division II and III schools reasonable substitutes? *See Todd,* 275 F.3d at 202.

Furthermore, the declaration does not address Division I men's soccer, Division I women's soccer, or Division I women's tennis at all. *See* Berri Decl. Ex. 5, at 38-61. To the extent that Plaintiffs define sport-specific markets, they must also provide sport-specific evidence for those markets. While the Court acknowledges that sport-specific markets may have more or less data available, that does not excuse Plaintiffs' burden to present what data is available. *See Robinson*, 172 F.4th at 294-95 ("We are merely holding that the Players presented no factual evidence here and therefore clearly failed to meet their burden of proof.").

*iii. Substantial Anticompetitive Effect*

Plaintiffs also bear a "heavy burden of proof" to establish anticompetitive effects. *Id.* at 292; *see also Alston*, 594 U.S. at 97 ("This was no slight burden."). Generally, "[t]o have an anticompetitive effect, conduct must harm the competitive *process* and thereby harm consumers." *Robinson*, 172 F.4th at 292 (emphasis original; citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir. 2002)). However, in the context of a monopsony, conduct must harm sellers, not consumers. *See Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) (". . . the persons specially injured . . . are sellers, not customers or consumers."). Furthermore, "[t]he reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Robinson*, 172 F.4th at 292 (quoting *Dickson*, 309 F.3d at 206).

While Plaintiffs have failed to define the relevant markets, "plaintiffs challenging a 'horizontal restraint'—a restraint of trade among direct competitors—need not always define the relevant market to establish anticompetitive effects." *Robinson*, 172 F.4th at 293 n.12 (citing *Am. Express*, 585 U.S. at 542 n.7). Plaintiffs can also establish anticompetitive effects "by otherwise demonstrating the horizontal restraints had an adverse effect on competition." *Id.* However, this demonstration requires *proof of actual detrimental effects* on market competition. *See FTC v.*

*Indiana Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986) ("Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'") (quoting 7 P. Areeda, Antitrust Law ¶ 1511, p. 429 (1986)).[6]

"Actual detrimental effects on competition include reduced output, increased prices, or decreased quality in the relevant market." *Robinson*, 172 F.4th at 292 (citing *Am. Express*, 585 U.S. at 542). In the labor market context, actual detrimental effects can also include "decreased wages." *See id.* Indeed, "[a]ntitrust harm from a monopsony in a particular labor market may also be demonstrated by underemployment, nonemployment or wage suppression." *Martinson v. NCAA*, 804 F. Supp. 3d 1109, 1127 (D. Nev. 2025) (citing U.S. Office of the President Council of Econ. Advisers, Issue Brief, *Labor Market Monopsony: Trends, Consequences, and Policy Responses*, (Oct. 2016); Eric A. Posner, Suresh Naidu, & Glen Weyl, *Antitrust Remedies for Labor Market Power*, 132 Harv. L. Rev. 536, 558 (2018)).[7]

Here, Plaintiffs allege a horizontal restraint. Plaintiffs assert that NCAA is "an unincorporated association of member institutions that, through its constitution and bylaws, imposes horizontal agreements on its members restraining the terms on which its members may compete for the services of college athletes." Compl. ¶ 48. Plaintiffs further allege that "[t]he NCAA's application of Bylaw 12.6 to Plaintiffs is an unreasonable restraint of trade in [the listed markets] under the rule of reason." *See id.* ¶ 52.

---

[6] Proof of actual detrimental effects on market competition is commonly referred to as "[d]irect evidence of anticompetitive effects." *E.g.*, *Am. Express*, 585 U.S. at 542.

[7] The preliminary injunction in *Martinson* was stayed by the Ninth Circuit pending appeal. *See Martinson v. NCAA*, 25-5962, U.S. Ninth Circuit Court of Appeals, September 22, 2025.

Upon review, the Court does not find sufficient proof of actual detrimental effects on market competition in any of the Division I sport-specific markets listed by Plaintiffs. *See id.* ¶ 50.

Plaintiffs first allege that the restraint "reduces the total number of Division I competition eligible athletes in the affected sport-specific markets in the 2026-27 season." *Id.* ¶ 52. However, Plaintiffs do not offer proof of *actual* underemployment in any of the sport-specific markets in the 2026-27 season, nor any proof that a smaller pool of eligible athletes will necessarily result in underemployment in any of these markets. Plaintiffs also assert that at least thirteen of them have roster spots available. *Id.* ¶¶ 11-24. However, Plaintiffs do not offer any market-wide data on available roster spots, nor any proof that these roster spots will not otherwise be filled.

Plaintiffs next allege that the restraint "depresses the compensation Plaintiffs can command in the market for revenue sharing and NIL agreements to zero, because ineligible athletes cannot participate." Compl. ¶ 52. Again, Plaintiffs do not offer proof of *actual* wage depression in any of the sport-specific markets in the 2026-27 season. It is also not clear that Plaintiffs are members of the sport-specific markets, given that they are "ineligible" and "cannot participate." *Id.* Even if Plaintiffs are members, they are but a small subset of thousands of Division I athletes. Plaintiffs do not offer any market-wide data on the depression of wages. *See Robinson*, 172 F.4th at 292 ("The reasonableness of a restraint is evaluated based on its impact on competition as *a whole* within the relevant market.") (emphasis added).[8]

The Court has critical, factual questions that must be resolved before the Court can make any finding of actual detrimental effects on market competition. Should ineligible athletes, such as Plaintiffs, be considered members of the sport-specific markets for the purpose of evaluating

[8]Testimony from Plaintiff Dewain Trotter suggested that he still expected to profit from NIL, even if he does not play in the 2026-27 season.

underemployment and wage suppression? Should athletes who do not profit from revenue sharing or NIL agreements be considered "employed" for the purpose of evaluating underemployment? The answers to these questions are not obvious to the Court.

Currently, the Court is inclined to agree with the district court's reasoning in *Michael Anthony Cruz, Jr. v. NCAA*, No. 3:26-CV-00588-MMD-CLB (D. Nev. Aug. 28, 2026). The challenged restraint does not subtract from an "*already-existing* supply of *eligible* players." *Id.* at 13 (emphasis original). Plaintiffs were already "ineligible for another season of [Division I] competition" under the prior rules. *Id.* Hence, the restraint does not remove Plaintiffs "or similarly situated athletes from a pool of players who otherwise would have been available to [Division I] programs. Rather it declined to *add* those athletes to the pool under the new framework." *Id.* at 13-14 (emphasis original). Thus, Plaintiffs' theory of underemployment and depression of wages is simply a consequence of Plaintiffs' exclusion under the *prior rules*, "which does not, without more, establish an overall decrease in [wages or employment] in the alleged market[s]." *Id.* at 13.

*iv. Procompetitive Rationale*

As explained above, the Court does not find sufficient evidence to define any of the Division I sport-specific markets listed by Plaintiffs, nor sufficient proof of actual detrimental effects on market competition in these markets. "An ill-defined market infects the remaining steps of the rule of reason analysis." *Robinson*, 172 F.4th at 294 n.14. As such, we do not reach Plaintiffs' remaining arguments as to procompetitive justifications. Thus, for the reason stated, the Court finds Plaintiffs are unlikely to succeed on the merits of their Sherman Act claim. Therefore, the Court also does not reach the remaining steps of the standard for a preliminary injunction.

### B.
### STATE LAW CLAIMS

#### 1.
#### Breach of Implied Covenant of Good Faith and Fair Dealing

In Count II, Plaintiffs allege the Division I Manual, containing the NCAA's Constitution and Bylaws, is a contract between the NCAA and its member institutions, and they are the third-party beneficiaries of that contract. Compl. ¶ 56. Specifically, Plaintiffs argue nearly every substantive Bylaw in the Division I Manual is directed at regulating their participation in Division I sports and the NCAA has tied their eligibility status to "a concrete financial benefit running directly to the athlete, not merely to the member institution." Pls.' Reply at 4, ECF No. 13. Therefore, Plaintiffs assert they are third-party beneficiaries of the contract and are entitled to enforcement under West Virginia Code § 55-8-12. Compl. ¶ 56.[9]

However, West Virginia Code § 55-8-12 provides that "[a] third-party beneficiary may enforce a contract only if it is made for *its sole benefit*." *Donna S. v. Travis S.*, 874 S.E.2d 746,

[9]Specifically, Plaintiffs claim the NCAA breached an implied covenant of good faith and fair dealing in a number of ways, including:

> (a) applying its 5-for-5 legislation to grant five seasons of competition to athletes who graduated from high school in 2023 or later while arbitrarily excluding Plaintiffs, who graduated only one year earlier; (b) permitting former professional basketball players to return to NCAA competition without losing a season of competition for each professional season played, while denying a fifth season to Plaintiffs who never competed professionally; (c) counting participation of as little as a few minutes in a single game as an entire season of competition; and (d) failing to clarify the reach of its Class-of-2022 definition as applied to early-enrollee Plaintiffs, resulting in Marshall University Compliance's inability to clear those Plaintiffs for competition despite their status as Class-of-2022 high school graduates whose first season of intercollegiate competition was 2022-23.

755 (W. Va. 2022) (emphasis added; quoting West Virginia Code § 55-8-12, providing, in part, "[i]f a covenant or promise be made for the sole benefit of a person with whom it is not made . . . such person may maintain, in his own name, any action thereon which he might maintain in case it had been made with him only, and the consideration had moved from him to the party making such covenant or promise" ). At the hearing Plaintiffs argued they are the sole beneficiaries of the Bylaws in the Division I Manual, but the Court disagrees. As argued by the NCAA, the Constitution and Bylaws contained in the Division I Manual were not made *solely* for Plaintiffs' benefit as student-athletes. The Manual is expansive and also provides benefits to the member institutions, divisions, conferences, and athletic personnel. *See, e.g., Div. I 2025-26 Manual*, Const. Art. 6, at 11 (giving "control and responsibility for the conduct of intercollegiate athletics . . . [to] the institution itself and the division and conference of which it is a member"); Bylaws, Art. 11, at 27-34 (covering "Conduct and Employment of Athletics Personnel"). The Court has no doubt student-athletes receive many benefits under the Division I Manual. However, the Court must look at the Manual as a whole, and it is clear they are not the *sole* beneficiaries. Thus, Plaintiffs cannot bring an action under West Virginia law.

In support of their argument they qualify as third-party beneficiaries, Plaintiffs cite *Washington v. NCAA*, No. 26-0896-III (Chancery Ct. Davidson Cty., Tenn. July 31, 2026), and *Godfrey v. NCAA*, No. 26CV05617 (Super. Ct. Cobb Cty., Ga. Aug. 5, 2026). Yet, not only are these cases not binding on this Court, neither of these cases have the restrictive language adopted by the West Virginia legislature and applied by West Virginia courts. In *Washington*, the Chancery Court found the Division I student-athletes were intended beneficiaries of the contract between the NCAA and member schools under Tennessee law that only requires a contract be "intended for

---

*Id.* ¶ 60.

[the student-athletes] direct benefit." *Washington*, No. 26-0896-III, at 22 (internal quotation marks and citation omitted). Likewise, in *Godfrey* the Georgia Superior Court adopted and incorporated the decision in *Washington* and *Borovicanin v. NCAA*, No. A2603352 (Ohio Ct. of Comm. Pleas July 9, 2026), in holding the student-athletes qualified as third-party beneficiaries. No. 26CV05, at 3-5. In *Borovicanin*, the court relied upon Ohio law stating that a plaintiff must show "the contract was made and entered into with the intent to benefit the third person, not a mere incidental or indirect benefit." *Borovicanin*, No. A2603352, at 7 (citation omitted). The individual state laws these cases rely upon cast a much wider net for those who qualify to sue as third-party beneficiaries than the much more restrictive language in West Virginia. Here, the law explicitly and unambiguously provides that a third party may bring an action on a contract only if it was made for the sole benefit of that third party.

Plaintiffs attempt to skirt this very precise language by insisting the rule does not prohibit a member of a class from maintaining an action as a third-party beneficiary. Be that as it may, the class then must be the sole beneficiary of the contract. It would be nonsensical under the statute to allow an individual class member to bring an action when the class itself is not the sole third-party beneficiary of the contract, while denying that same right to an individual who is neither a member of a class nor a sole beneficiary. The unambiguous statutory language simply does not permit such a result. Clearly, Plaintiffs in this case are not the sole beneficiaries of NCAA's Constitution and Bylaws. Accordingly, the Court finds that Plaintiffs are not likely to succeed on the merits of their claim for breach of implied covenant of good faith and fair dealing as third-party beneficiaries.

**2.**
**West Virginia Consumer**
**Credit and Protection Act**

The West Virginia Consumer Protection Act (WVCCPA), West Virginia Code § 46A-6-101 *et seq.*, provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." W. Va. Code § 46A-6-104. In Count III, Plaintiffs claim that the NCAA's conduct violates this provision because "the NCAA and its members hold monopsony power in sport-specific Division I labor markets, and the selective withdrawal of eligibility from the Class of 2022 while extending it to" the class of 2023 and former professional basketball players constitutes "a competition-suppressing practice against the very consumers of NCAA-controlled athletic services who are foreclosed from participating." Pls.' Mot. for a Prelim. Inj. at 10-11 (citation omitted). Plaintiffs argue the NCAA's decision to change the rules is "unfair" under the WVCCPA.

On the other hand, the NCAA asserts Plaintiffs cannot bring a WVCCPA claim because they are not "consumers" entitled to bring a cause of action within the meaning of the Act. As relevant to this case, the WVCCPA defines a "consumer" as "a natural person to whom a sale or lease is made in a consumer transaction and a 'consumer transaction' means a sale or lease to a natural person or persons for a personal, family, household or agricultural purpose." W. Va. Code § 46A-6-102(2). In addition, West Virginia Code § 46A-6-106(a) provides "any person who purchases or leases goods or services and thereby suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice prohibited or declared to be unlawful by the provisions of this article may bring" a private cause of action. W. Va. Code § 46A-6-106(a), in part. As Plaintiffs are not individuals who purchased or leased goods or services, the NCAA maintains Plaintiffs do not have a private right

of action under the WVCCPA to bring a claim. Although the NCAA concedes the WVCCPA should be broadly construed,[10] it argues it cannot be extended beyond what the statute recognizes.

In support of their claim, Plaintiffs attempt to cast themselves as "consumers" under Article 6 of the WVCCPA. However, Article 6 very clearly requires them to be persons "who purchase[d] or lease[d] goods or services," and they do not meet this definition. *Id*. Plaintiffs attempt to avoid this obvious conclusion by arguing the member institutions act as intermediaries between the NCAA and Plaintiffs and the NCAA is a "seller" because its eligibility rules determine whether Plaintiffs "receive the educational services, scholarship funds, and revenue-sharing compensation those institutions otherwise stand ready to provide." Pls.' Reply at 7. The Court finds characterizing the NCAA's eligibility rule as a "sale" is too far of a stretch.

When these Plaintiffs began their student-athlete pursuits, they were eligible to complete for four seasons of competition in a five-year period. Plaintiffs admit in their Complaint that they exhausted their eligibility under the rule as it existed while they competed. The new eligibility rule, which was not made retroactive to apply to them, is not a "sale" of anything by the NCAA either on its own or somehow funneled through its member institutions. Nor are Plaintiffs "consumers" who purchased or leased goods or services from the NCAA through the member institutions. As such, Plaintiffs do not have a right under West Virginia Code § 46A-6-106(a) to bring an action for a perceived violation of West Virginia Code § 46A-6-104,[11] and the Court finds they are unlikely to succeed on this claim.

---

[10]*See* West Virginia Code § 46A-6-101(1) providing, in part, "this article shall be liberally construed so that its beneficial purposes may be served." W. Va. Code § 46A-6-101(1).

[11]In support of its position, the NCAA cites *Young v. EOSCCA*, 800 S.E.2d 224 (W. Va. 2017), which considered whether a plaintiff qualified as a consumer under an entirely different section of the WVCCPA that uses different definitions for who qualifies as a "consumer." Therefore, the Court finds *Young* is of very limited value here.

**3.**
**Promissory Estoppel**

In the alternative, Plaintiffs make a claim of promissory estoppel in Count IV. Plaintiffs allege the NCAA promised that it would apply its eligibility rules "consistently and fairly and that all Division I athletes would be afforded equal opportunity to compete." Compl. ¶ 68. Plaintiffs assert they relied upon these promises to their detriment when they made "decisions about enrollment, redshirting, transfer, and pursuit of professional opportunities." *Id.* ¶¶ 69-70. As this Court stated in *Williams v. Rigg*, No. 3:19-CV-00423, 2021 WL 4129592 (S.D. W. Va. Sept. 9, 2021), a claim of promissory estoppel in West Virginia requires proof of the following:

> (1) a promise; (2) reasonable reliance on the promise by the plaintiff; (3) that it was foreseeable to the defendant that the plaintiff would rely on the promise; (4) that the plaintiff suffered damages as a result of her reasonable reliance upon the promise of the defendant; and (5) under a circumstance that injustice can only be avoided through enforcement of the promise.

2021 WL 4129592, at *4 (quoting *Koerber v. Wheeling Island Gaming, Inc.*, Civ. Act. No. 5:12-97, 2013 WL 162669, at *4 (N.D. W. Va. Jan. 15, 2013) (citing *Everett v. Brown*, 321 S.E.2d 685 (W. Va. 1984)). As the Court mentioned previously, the NCAA never promised Plaintiffs could compete for five seasons. Instead, the Bylaws provided them with the right to play for four seasons in a five-year window, which the NCAA gave them and fulfilled that promise. The Court finds it is implausible that Plaintiffs reasonably relied upon an alleged promise to treat them "consistently and fairly" to support a claim they detrimentally relied upon an eligibility rule they knew or should have known never applied to them. In addition, it is a mere certainty that the NCAA did not foresee Plaintiffs detrimentally relying on eligibility rule changes that expressly did not apply to them.

In their Reply, Plaintiffs take a different approach and argue the NCAA's representations that they had to keep their amateur status for collegiate participation caused them to immediately

enroll in college after high school and forego professional opportunities. However, as stated above, Plaintiffs got exactly what they were promised. They all completed their four years of eligibility at the collegiate level, and the rules at the time did not allow them to play professionally and then return to the college-level play. The fact the NCAA thereafter changed the eligibility rules does not entitle Plaintiffs to a promissory estoppel claim simply because the eligibility rule changes benefit others. Therefore, for the foregoing reasons, the Court finds Plaintiffs are unlikely to succeed on the merits of their alternative claim for promissory estoppel.

**4.**
**Name, Image, and Likeness Statutes**

In Counts V and VI, Plaintiffs allege the NCAA has violated both West Virginia and Ohio law protecting Plaintiffs' rights to earn compensation from their NIL. West Virginia law provides that no "organization with authority over intercollegiate athletics may (1) Open an investigation, penalize, suspend, take other adverse action, or declare a student-athlete ineligible from intercollegiate athletic competition; or (2) Reduce, cancel, revoke, or not renew an athletic scholarship for a student-athlete" because a student-athlete engages in authorized activities. W. Va. Code § 18B-22-3(a). Similarly, under Ohio law, an "organization with authority over intercollegiate athletics shall not . . . (A) Prevent a student-athlete of a state institution of higher education . . . from fully participating in intercollegiate athletics because the student-athlete . . . (1) Earns compensation as a result of the use of the student-athlete's name, image, or likeness[.]" Ohio Rev. Code Ann. § 3376.03(A)(1), in part. Plaintiffs argue that by denying "Plaintiffs eligibility for the 2026-27, the NCCA forecloses the NIL compensation tied to their status as eligible Division I athletes" at both West Virginia and Ohio institutions and, therefore, they are entitled to injunctive relief under the respective state statutes. Pls.' Mot. for a Prelim. Inj. at 11-12. However, as the NCAA points out, these statutes do no apply to the current situation. Plaintiffs

have not lost eligibility because they accepted NIL compensation. Rather, they are not eligible because they exhausted their four years of eligibility under the rules that apply to them. Thus, the Court finds this claim cannot support the issuance of a preliminary injunction.

**5.**
**Tortious Interference**

In Count VII, Plaintiffs allege tortious interference with contractual and business relationships. In particular, Plaintiffs claim they "have existing and prospective contractual and business relationships with Marshall University and other NCAA institutions, including relationships concerning roster opportunities, athletic aid, revenue-sharing, NIL opportunities, training, and competition." Compl. ¶ 82. Plaintiffs assert the NCAA's new eligibility rules "intentionally and improperly interfere[] with Plaintiffs' ability to enter into, continue, and perform those relationships," which has caused them injury. *Id*. ¶¶ 83, 84.

"To prove tortious interference with business relations under West Virginia law, 'a plaintiff must show: (1) existence of a contractual or business relationship or expectancy; (2) an intentional act of interference by a party outside that relationship or expectancy; (3) proof that the interference caused the harm sustained; and (4) damages.'" *Nitro Constr. Servs., Inc. v. Pilot Travel Ctrs.*, *LLC,* Civ. Act. No. 3:25-00026, 2025 WL 2487787, at *2 (S.D. W. Va. Aug. 28, 2025) (quoting *Torbett v. Wheeling Dollar Sav. & Trust Co*., 314 S.E.2d 166, 167 (1983)). To establish an intentional act of interference, a plaintiff must show "the defendant intended that their actions interfere with the plaintiff's relationship or expectancy, not merely that the defendant intended to do the act that caused the interference." *Id.* (citing Restatement (Second) of Torts § 766 cmt. j (A.L.I. 1979)).

The NCAA maintains Plaintiffs no longer have an expectancy of a business relationship with their respective universities because "they exhausted their eligibility under the Bylaws in place when they played." NCAA's Resp. in Opp. to Pls.' Mot. for Prelim. Inj. at 18. Additionally,

by implementing new eligibility requirements, the NCAA argues its decision to not apply the rule retroactively was not intentional interference with Plaintiffs' relationship with the universities. Moreover, the NCAA asserts there is nothing to prevent Plaintiffs from continuing to monetarize their NIL. Plaintiffs did not reply to any of these arguments.

Upon consideration, the Court finds Plaintiffs had a business relationship with their respective universities during their period of eligibility. However, that eligibility ended when they finished their fourth season of play. Under these circumstances, the Court finds the NCAA's decision to not retroactively apply the new eligibility rules to them is not intentional interference with the Bylaws Plaintiffs operated under while they played. Therefore, the Court finds Plaintiffs are unlikely to succeed on a claim of intentional interference.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court finds that Plaintiffs are unlikely to succeed on the merits of their claims and **DENIES** their Motion for a Preliminary Injunction. ECF No. 11.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: September 9, 2026

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE