**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

DEWAIN BOOGIE TROTTER,
DEMARCUS LACEY,
BRYCE BLEVINS,
BAILEY FISHER,
JOHANNA STROM,
PEYTON ILDERTON,
MEREDITH MAIER,
BLESSING KING,
PAIGE SIMPSON,
RYAN HOLMES,
HANNAH WYLER,
KSENIA MAMONTOVA,
ALLIE MARTIN, and
LEILA BOUSEDDRA,

Plaintiffs,

v. CIVIL ACTION NO. 3:26-0523

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,

Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Plaintiffs Dewaine Boogie Trotter and Demarcus Lacey's Motion for Reconsideration of the Court's Order Denying Preliminary Injunction, or in the Alternative, Renewed Motion for Temporary Restraining Order and Preliminary Injunction. ECF No. 27.[1] Defendant National Collegiate Athletic Association (NCAA) opposes the motion. The Court held a hearing on the motion on November 17, 2026. Upon consideration of the parties'

---

[1]In their motion, Plaintiffs Trotter and Lacey also requested expedited discovery. The Court denied that part of their motion by Memorandum Opinion and Order entered on November 3, 2026. *Trotter v. NCAA*, Civ. Act. No. 3:26-0523, 2026 WL 3320147 (S.D. W. Va. Nov. 3, 2026).

arguments and the testimony of their experts, the Court **DENIES** the motion. Also pending is Plaintiffs Trotter and Lacey's Motion for Clarification Regarding Scope of Requested Injunctive Relief. ECF No. 42. For the reasons stated below, the Court **DENIES** this motion as well.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Trotter and Lacey are student-athletes, who entered college in 2022 and exhausted four seasons of intercollegiate competition. Compl. ¶¶ 11-12 ECF No. 1.[2] Both Trotter and Lacey have roster spots available to them on Marshall University's football team for the 2026-27 season. *Id*. Marshall University's football team falls within the Football Bowl Subdivision (FBS) of Division I under the NCAA's rules. The NCAA is an association of United States colleges and universities that "sets and enforces the rules of [athletic] eligibility and competition for its member institutions in Division I, Division II, and Division III athletics." *Id.* ¶ 25.

In this Court's earlier decision, it explained that the NCAA historically "has limited student-athletes to participating in four seasons of college sports." *Trotter v. NCAA*, Civ. Act. No. 3:26-0523, 2026 WL 2656556, at *1 (S.D. W. Va. Sept. 9, 2026) (citation omitted). The effect of this rule meant that both Plaintiffs Trotter and Lacey exhausted their four seasons of competition by the end of the 2025-26 season. However, as a result of the COVID-19 pandemic, the NCAA changed the rule and extended the eligibility for athletes who first enrolled in college between 2017 and 2020, and the NCAA recently permanently enacted a "5-for-5" rule for those student-athletes who began their college careers in 2023 or later. *Id*. The "5-for-5" rule allows those qualifying student-athletes to compete in up to five seasons within a continuous five-year period.

[2]Additional student-athletes are named in the Complaint, but they played other sports at either Marshall University or at Ohio University. Only Plaintiffs Trotter and Lacey have moved for reconsideration.

Consequently, "Plaintiffs, who graduated high school in 2022, may compete in college sports for only four years, while their peers who graduated the following year may compete for five years." *Id*. (footnote and citation omitted).

The NCAA's decision to exclude the Class of 2022 student-athletes from the new fifth year of competition strikes these students as arbitrary, discriminatory, and unfair, and it deprives them of a valuable opportunity to participate in athletics. While their loss is undeniable, and the Court remains sympathetic, the claims upon which they rely must meet the specific elements required by the law. Proof that they were treated differently or that they suffer significant loss does not establish, in and of itself, that Plaintiffs are likely to prevail.

Since the rule change, there has been a flurry of lawsuits across the United States from those who entered college in 2022, challenging the limitation on their eligibility under federal antitrust and a variety of state laws. This case is no different in that Plaintiffs seek relief under section 1 of the Sherman Act, 15 U.S.C. § 1, and West Virginia consumer and contract laws. On September 9, this Court entered its Memorandum Opinion and Order finding Plaintiffs are unlikely to succeed on the merits of any of their claims and denying their motion for injunctive relief. *Id*. at *12.

## II.
## STANDARD OF REVIEW

### A.
### Reconsideration under Rule 54(b)

Plaintiffs Trotter and Lacey now have produced an expert in support of their request for injunctive relief and ask the Court to reconsider its ruling under the Sherman Act. Motions for reconsideration of interlocutory orders are governed by Rule 54(b) of the Federal Rules of Civil Procedure. Rule 54(b) provides, in part, that ""any order or other decision . . . that adjudicates

fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before entry of a final judgment[.]" Fed. R. Civ. P. 54(b). "Motions for reconsideration of interlocutory orders are not subject to the strict standards applicable to motions for reconsideration of a final judgment," because "a district court retains the power to reconsider and modify its interlocutory judgments . . . at any time prior to final judgment when such is warranted." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003) (citation omitted). Nevertheless, courts in the Fourth Circuit look for guidance under Rule 59 of the Federal Rules of Civil Procedure and may reconsider an interlocutory order "(1) to follow an intervening change in controlling law; (2) on account of new evidence; or (3) to correct a clear error of law or prevent manifest injustice." *S. Indus. Contractors, LLC v. O'Brien & Gere of N. Am.*, Civ. Act. No. 2:19-1691-RMG, 2021 WL 11745350, at *1 (D.S.C. Apr. 21, 2021) (citations omitted).

As an initial matter, the NCAA argues Plaintiffs Trotter and Lacey are not entitled to reconsideration because none of these criteria apply. Specifically, the NCAA states there has been no change in the law since the Court's earlier decision, and it insists Plaintiffs have presented no evidence that was not available when they first moved for an injunction. As the Court explained at the hearing on November 17, however, the issues being raised in this case are constantly evolving. When, on August 21, 2026, the Tenth Circuit Court of Appeals granted the NCAA a stay[3] of the district court's decision in *Wisne v. NCAA*, Civ. Act. No. 1:26-03063-CNS-KAS, 2026 WL 2214234 (D. Colo. July 31, 2026),[4] which had granted a nation-wide preliminary injunction

[3] *Wisne v. NCAA*, No. 26-1309 (10th Cir. Aug. 21, 2026) (granting stay).

[4] *Opinion clarified,* Civ. Act. No. 1:26-03063-CNS-KAS, 2026 WL 2214320 (D. Colo. Aug. 2, 2026), and *rev'd and vacated,* No. 26-1309, 2026 WL 3368646 (10th Cir. Nov. 6, 2026).

allowing the Class of 2022 student-athletes to play a fifth season, it threw the seasons of those players into chaos. Time became of the essence, particularly for those whose season already had begun. As a result, actions were filed hastily across the United States challenging the NCAA's eligibility rule. Given the uniqueness of the situation and its application to the complexity of the Sherman Act, as implicated in this case, the Court has no doubt it was nearly impossible for Plaintiffs to line up an expert to produce a thorough report and be prepared to testify on such short notice.[5] Given this nearly impossible situation in which Plaintiffs found themselves, the Court finds that justice requires the Court to consider the merits of Plaintiffs Trotter and Lacey's motion.

**B.**
**Preliminary Injunction**

As stated in the Court's earlier decision, "[a] preliminary injunction is an extraordinary and drastic remedy." *Trotter*, Civ. Act. No. 3:26-0523, 2026 WL 2656556, at *1 (internal quotation marks and citations omitted). In order to be granted a preliminary injunction, "a plaintiff must establish: '(1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm if preliminary relief is not granted; (3) that the balance of equities favors them; and (4) that an injunction is in the public interest.'" *Id.* (quoting *Robinson v. NCAA*, 172 F.4th 271, 286 (4th Cir. 2026) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008))). To obtain relief, Plaintiffs must satisfy all four of these factors. *Id.* (citation omitted).

"'[T]his exacting standard of review is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature.'" *Robinson*, 172 F.4th at 286 (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003)). "Unlike prohibitory preliminary injunctions, mandatory preliminary injunctions alter,

[5]This action was filed just three days after the stay was granted in *Wisne*, and the Court held a hearing on Plaintiffs' motion for a preliminary injunction just nine days later.

rather than preserve, the status quo and therefore are disfavored, and warranted only in the most extraordinary circumstances." *Id.* (quoting 2311 *Racing LLC v. NASCAR*, 139 F.4th 404, 408 (4th Cir. 2025) (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1999); internal citation omitted). As this Court stated in its earlier decision, Plaintiffs in this case are "ask[ing] the Court to alter the status quo by requiring the NCAA to deem Plaintiffs eligible to play college sports during the [2026–27] school year." *Trotter*, Civ. Act. No. 3:26-0523, 2026 WL 2656556, at *2 (citing *Robinson*, 172 F.4th at 286). Therefore, Plaintiffs' motion is for "a mandatory injunction, and their 'showing of the requirements for relief must accordingly be indisputably clear.'" *Id.* (quoting *Robinson*, 172 F.4th 286).

Following the hearing, Plaintiffs filed a Motion for Clarification Regarding Scope of Requested Injunctive Relief. ECF No. 42. In their motion, they ask to "renew their request for temporary injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure." *Motion for Clarification Re: Scope of Requested Inj. Relief*, at 1. As the Court has proceeded to address and resolve Plaintiffs Trotter and Lacey's request to reconsider granting them a preliminary injunction, the Court finds no reason to grant a temporary restraining order and **DENIES** the same and their Motion for Clarification Regarding Scope of Requested Injunctive Relief.

## III.
## DISCUSSION

Although this Court's earlier decision denied Plaintiffs' motion under the Sherman Act and on state-law grounds, Plaintiffs Trotter and Lacey ask this Court only to reconsider its arguments under the Sherman Act. In relevant part, section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, *in restraint of trade or commerce* among the several States, or with foreign nations . . . ." 15 U.S.C. § 1, in part (emphasis added).

This Court previously explained that in analyzing whether an agreement violates section 1, it must apply the "rule of reason," which provides:

> [T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect. Should the plaintiff carry that burden, the burden then shifts to the defendant to show a procompetitive rationale for the restraint. If the defendant can make that showing, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

*Trotter*, Civ. Act. No. 3:26-0523, 2026 WL 2656556, at *2 (quoting *NCAA v. Alston*, 594 U.S. 69, 96-97 (2021) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); (internal quotation marks omitted)).

Generally, a court "must define the relevant market" when evaluating "whether the challenged restraint has a substantial anticompetitive effect." *Id.* at *3 (internal quotation marks and citations omitted). When a challenge is to a horizontal restraint, that is "a restraint of trade among direct competitors," a plaintiff "'need not always define the relevant market to establish anticompetitive effects.'" *Id.* (quoting *Robinson*, 172 F.4th at 293 n.12 (citing *Am. Express*, 585 U.S. at 542 n.7)). A plaintiff also can demonstrate "a substantial anticompetitive effect 'by otherwise demonstrating the horizontal restraints had an adverse effect on competition.'" *Id.* (quoting *Robinson*, 172 F.4th at 293 n.12).

**A.**
**Restraint on Commerce**

This Court previously determined that the dispute in this case reflects a restraint on commerce. *Id.* Student-athletes can earn a significant amount of money, "either by entering revenue-sharing agreements or selling the rights to their name, image, and likeness (NIL)." *Id.* (citation omitted). By excluding the Class of 2022, the NCAA's eligibility rule limits Plaintiffs "'participation in the labor market.'" *Id.* (quoting *Robinson*, 172 F.4th at 289). This "'restraint on

labor . . . interferes with student athletes' free exercise of their rights to engage in commerce . . . .'" *Id*. (quoting *Robinson*, 172 F.4th at 289). The Court finds no reason to reverse its prior decision on this point.

**B.**
**Relevant Market**

In their Complaint, Plaintiffs define the relevant "market for each Plaintiff [as] . . . the sport-specific Division I labor market for the sport in which that Plaintiff competes or seeks to complete." Compl. ¶ 50. In other words, it includes a broad swath of Division I sports, including football, baseball, women's soccer, women's tennis, women's basketball, softball, men's soccer, women's cross-country, and women's track and cross-country. *Id*. At the time of the first hearing, Plaintiffs did not have an expert who could provide fact-specific opinions as to the relevant market in this case. Rather, they offered a declaration that was submitted in *Wisne* by sports economist Dr. David Berri. *See Wisne*, 2026 WL 2214234, *11. This Court, however, found the proposed market definition was distinct from that in *Wisne*. *Trotter*, Civ. Act. No. 3:26-0523, 2026 WL 2656556, at *4. In *Wisne*, the relevant market was defined "as the entire 'labor market for Division I college athletics.'" *Id*. (quoting *Wisne*, 2026 WL 2214234, at *10). Where here, Plaintiffs limited their definition to the Division I sports in which they either competed or sought to compete. In the end, the Court found Plaintiffs simply failed to present "sufficient evidence to define any of the Division I sport-specific markets" they had listed. *Id*. at *5.

For purposes of this motion, Plaintiffs Trotter and Lacey now limit their proposed relevant market further to just Division I football. To do so, Plaintiffs Trotter and Lacey must produce "factual evidence" to meet their "burden of proof to establish market definition[.]" *Robinson*, 172 F.4th at 294-95 (footnote omitted). Generally speaking, "[t]he relevant market is defined as the area of effective competition, meaning the arena within which significant substitution in

consumption or production occurs." *Id.* at 293 (internal quotation marks and citation omitted). More specifically with respect to labor markets, the relevant "market is comprised of those employers seen by workers as reasonably good substitutes." *Id.* (citations omitted). As Plaintiffs argue a violation of the Sherman Act, they also have the burden to prove both "the relevant product and geographic markets[.]" *Id.* (citation omitted). In determining whether Plaintiffs have met their burden, the Court is required to "engage in a fact-specific analysis of the relevant market," particularly where the parties disagree, and make factual findings as to that market. *Id.* at 294 (citations omitted).

In support of their position that Division I football is the relevant market, Plaintiffs retained an economist and professor of sport business, Dr. Joel G. Maxcy, who provided a declaration of his expert opinions and gave testimony at the November 17 hearing. Dr. Maxcy "define[d] the relevant market as the national labor market for NCAA Division I men's football athletes' services." Decl. of Joel G. Maxcy, Ph.D. ¶ 54 (Sept. 28, 2026), ECF No. 27-3.[6]

In reaching his conclusion, Dr. Maxcy draws a comparison of revenue and expenditures to distinguish between football programs at Division I, II, and III schools, and he testified that deeming Division I football as the relevant market makes sense from an economic perspective. To this point, Dr. Maxcy describes the uniqueness of Division I football. Division I football generates far more revenue than Division II or Division III. The schools in the "Power 4" of the FBS in Division I "average more than $100 million per year in college sports revenue." *Id.* ¶ 80 (footnote omitted). Additionally, those who are included in Division I's Football Championship Subdivision

---

[6]Plaintiffs submitted three versions of Dr. Maxcy's Declaration. Two of the versions, found at ECF Nos. 27-1 and 27-4, have columns to the side with various comments. ECF No. 27-3 does not have comments, but not all the Tables Dr. Maxcy attached to his Declaration are decipherable in ECF No. 27-3. To view all the Tables, it is necessary to look at ECF Nos. 27-1 and 27-4.

(FCS) average revenue exceeding $25 million. *Id.* ¶ 81. On the other hand, the revenue of Division II football schools is approximately $10.5 million, Division III football schools bring in revenue of just over $3 million, and Junior Colleges (JUCOs) bring in even less revenue than that of Division III. *Id.* ¶¶ 82-83.

Likewise, Division I schools vastly outspend Divisions II and III schools. In Table 1 that Maxcy attached to his declaration, it shows average expenses of Division I FBS schools as $114,556,709 and Division I FCS schools as $27,809,189. *Id.* at App. 1, Table 1. In contrast, Division II football schools only had average expenses of $9,237,611, and Division III football schools had an average of $5,144,544. *Id.*

Dr. Maxcy further points out that far more spectators attend Division I football games than the other Divisions. In 2024, the average attendance for FBS and FCS schools was 26,979, as opposed to an average attendance of 3,006 spectators for Division II schools and 1,674 spectators for Division III. Decl. of Maxcy ¶ 89. As Division I games are widely televised, it further increases the exposure of Division I players and potential scouting by professional teams.

Division I schools also are able to recruit the top high school football players, offering them an array of unique and exclusive incentives. Dr. Maxcy describes such things as:

(i) the ability to exchange athletics services for the payment of the partial or full cost of an education plus room and board;
(ii) high-quality academic educational services;
(iii) top-of-the line training facilities;
(iv) high-quality coaches that will best be able to launch players to professional careers;
(v) national publicity through national championships and nationwide broadcasting contracts;
(vi) opportunities to profit from NIL agreements;
(vii) competition at the highest level of collegiate athletics.

*Id.* ¶ 55. Dr. Maxcy asserts "[t]he exclusivity of the Division I football labor market is further supported by roster limits, scholarship constraints, and the high concentration of NIL activity in

Division I programs." *Id.* ¶ 56. His findings include a comparison between Division I and the other Divisions based on their compensation structures, including NIL and other forms of compensation.

Additionally, Dr. Maxcy testified that the NFL, the Canadian Football League (CFL), and the United Football League (UFL) are not good substitutes for Division I football. Of the approximately 7,000 college senior football players, the NFL only selected 257 players during its 2025 draft. *Id.* ¶ 95. The CFL has a league-wide roster limit of 207 positions for United States players, and the UFL only has 400 active roster positions. *Id.* ¶¶ 99, 102. This relatively small number of positions means only the top players get selected to play professional football, with the overwhelming number coming from Division I schools.

Dr. Maxcy cites *NCAA v. Alston*, 594 U.S. 69 (2021), in which the Supreme Court mentions the district court's conclusion that "the 'NCAA's Division I essentially *is* the relevant market for elite college football'" as there are not "'viable substitutes'" for the "'athletic services in . . . FBS football." *Alston*, 594 U.S. at 81 (quoting *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 375 F. Supp. 3d 1058, 1067, 1070 (N.D. Cal. 2019), aff'd, 958 F.3d 1239 (9th Cir. 2020) (emphasis in the district court's opinion)). However, neither party challenged "the district court's definition of the relevant market" before the Supreme Court and, although the Supreme Court took it as given, it stated it "express[ed] no view on" it, only focusing on the objections actually raised. *Id.* at 86-87. Moreover, as the Ninth Circuit recently stated in *Blythe v. NCAA*, 190 F.4th 857, 865 (9th Cir. 2026), "the realities of college athletics as it stood in *Alston* have dramatically changed in the subsequent five years" due to the profit opportunities players now have. 190 F.4th at 865. Although Dr. Maxcy opined at the hearing that the boundaries of the market have not changed since *Alston* as the relationships between Division I and Divisions II and III and the professional

leagues are the same, the Court is unpersuaded that *Alston* itself is particularly useful in defining the relevant market, and Dr. Maxcy does not rest on *Alston* alone.

In support of its position, the NCAA offered the declaration and expert testimony of economist Dr. Frederick Flyer. As to the relevant market, Dr. Flyer disagrees with Dr. Maxcy that the relevant market is all of Division I football. Dr. Flyer opines there is a sharp distinction "between Power 4 and FBS schools versus other Division I schools" and Dr. Maxcy's use of "consumer metrics do[es] not appear to support his conclusion of a broad Division I football market." Decl. of Frederick Flyer, Ph.D. ¶15(a) (Oct. 27, 2026), ECF No. 30-1. Dr. Flyer asserts Dr. Maxcy's reliance on general revenue data, attendance records, and player compensation to define Division I football as the relevant market lacks standard empirical analysis. *Id*. Specifically, Dr. Flyer points out that Dr. Maxcy did not use any standard analysis that economists use to define the relevant market, such as a hypothetical monopolist test that "defines the smallest group of substitutes that would constrain a small but significant non-transitory increase in price ('SNNIP') test, or for labor markets, a decrease in wages." *Id*. ¶18. Dr. Flyer further observes that Dr. Maxcy "calculates no elasticity estimates of substitution; nor examines substitution of alternative options for student-athletes on any margin." *Id*.

Dr. Maxcy acknowledges that he needs additional data to perform a full market analysis, but the data is not publicly available and is primarily within the control of NCAA and its affiliated partners. Decl. of Maxcy, ¶¶ 52-53. For instance, in his Rebuttal Declaration Dr. Maxcy states that without "publicly available data on the NIL and revenue sharing earnings of NCAA athletes . . . econometric analysis [is] unmanageable." Rebuttal Decl. of Dr. Joel G. Maxcy ¶ 11 (Oct, 30, 2026), ECF No. 31-1. Additionally, Dr. Maxcy explains that "the calculation of cross price elasticities, SSNIP tests and hypothetical monopolist tests are all indirect methods of establishing

monopsony in a relevant market," and in 2011 the Commissioner of the Federal Trade Commission "explained '. . . the 2010 Guidelines endorse the use of direct evidence of competitive effects,' and that the '. . . Guidelines explain that direct evidence can reduce or eliminate the need to rely on concentration statistics or to define a relevant market using traditional tools.'" *Id.* ¶¶ 12-13 (quoting J. Thomas Rosch, *The Past and Future of Direct Effects Evidence* 8 (Fed. Trade Comm'n, Remarks Before the ABA Section of Antitrust Law's 59th Spring Meeting, Mar. 30, 2011)).

In considering the parties' arguments and the expert testimony in making a fact-specific analysis of the relevant market as required by *Robinson*, the Court is mindful that this case is at the injunction stage and discovery has not even started. With this backdrop, the Court finds that Dr. Maxcy's definition of the relevant market as "the national labor market for NCAA Division I men's football athletes' services"[7] sufficiently defines "the area of effective competition." *Robinson*, 172 F.4th at 293. Specifically, the Court finds the characteristics that Dr. Maxcy describes in his Declaration and his testimony clearly distinguish Division I football from Divisions II and III and JUCOs. For instance, the Court finds the revenues and expenditures in Division I football far exceed the revenues and expenditures of the other Divisions and JUCOs. Division I schools attract significantly larger crowds at games, and the games are widely televised. As a result, football players at Division I schools get considerably more exposure and potential scouting by professional teams. Indeed, the overwhelming majority of professional football players come from Division I schools. Additionally, Division I schools are able to recruit the top high school talent, enticing them with such perks as high-quality academic opportunities, state-of-the art training facilities, top-tier coaches, national exposure, better scholarships, NIL profits, and a

[7] Decl. of Maxcy ¶ 54.

high-level of competition. The Court concludes these differences make Divisions II and III and JUCOs inadequate substitutes for Division I football.

Likewise, the Court finds that the NFL, CFL, and UFL are not good substitutes for Division I football. There are approximately 7,000 college seniors playing football. However, the odds of those players being drafted or selected for a professional team are extraordinarily slim. Typically, only the best Division I players will get drafted or earn a spot on a professional team, leaving the vast majority of players pursuing a different career. Moreover, the pay scale for those drafted by an NFL team in particular far exceeds the NIL revenue a college football player may earn.

Although, as Dr. Flyer points out, there are some differences between FBS and FCS schools within Division 1 football, the Court finds these differences are not significant enough in the context of the pending motion to undermine Dr. Maxcy's definition of the relevant market. The Court recognizes that FBS and FCS schools are not exclusive to one another. As they are all part of Division I, they frequently play against one another, receive national coverage, and offer many of the same incentives to players. Clearly, the differences between FBS and FCS schools are not as remarkable as those between Division I and Divisions II and III and JUCOs. Therefore, at this point in the proceedings, the Court is satisfied that Plaintiffs Trotter and Lacey have sufficiently met their burden to show that the relevant market is the national labor market for NCAA Division I men's football athletes' services.

**C.**
**Anticompetitive Effects**

To show anticompetitive effects, plaintiffs must provide either *direct* or *indirect* evidence of anticompetitive effects in a market. *Am. Express*, 585 U.S. at 542. For plaintiffs who successfully define the relevant market and establish market power, *indirect* evidence suffices. *See Robinson*, 172 F.4th at 293 n. 12. However, for plaintiffs who fail to define the relevant market or

establish market power, only *direct* evidence suffices, and even then, only if the plaintiffs are challenging a "horizontal restraint"—a restraint of trade among direct competitors. *See id.*

Direct evidence of anticompetitive effects is the "proof of actual detrimental effects on competition." *Am. Express*, 585 U.S. at 542 (quoting *FTC v. Indiana Federation of Dentists,* 476 U.S. 447, 460 (1986)). "Actual detrimental effects on competition include reduced output, increased prices, or decreased quality in the relevant market." *Robinson*, 172 F.4th at 292 (citing *Am. Express*, 585 U.S. at 542). In the labor market context, actual detrimental effects can also include "decreased wages." *See id.* Indeed, the key elements of competitive harm in labor markets are (1) decreased wages and (2) increased unemployment.[8]

Conversely, indirect evidence of anticompetitive effects is "proof of market power plus some evidence that the challenged restraint harms competition." *Am. Express*, 585 U.S. at 542 (citing *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1073 (11th Cir. 2004)). Indirect evidence typically requires "specific allegations linking market power to harm to competition in that market." *Spanish Broad. Sys.*, 376 F.3d at 1073. At the very least, indirect evidence requires a "coherent" economic theory as to how the challenged restraint harms competition. *Robinson*, 172 F.4th at 292-93 n. 12. (citing *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th

---

[8]*See* Eric A. Posner, Suresh Naidu, & Glen Weyl, Antitrust Remedies for Labor Market Power, 132 Harv. L. Rev. 536, 558 (2018) (". . . monopsony power has two effects. It redistributes from workers to employers by lowering wages. . . . This leads to increased unemployment or nonemployment as workers find prevailing wages unacceptable and exit the labor force or refuse to take available jobs."); Decl. of Maxcy ¶ 49 ("The concurrent limit of compensation and number of jobs is textbook monopsony theory, whereby the monopsonist restricts the number of jobs for the purpose of suppressing worker wages." ); Decl. of Flyer ¶ 33 ("Competitive harm to labor markets manifests in a reduction in the quantity of labor demanded, and/or a reduction in the wage rate being offered for an individual with a certain set of skills."). Dr. Maxcy also testified at the hearing that the two objectives of a monopsony are to (1) suppress wages and (2) suppress employment.

946, 983–84 (9th Cir. 2023)). As such, indirect evidence "need not always be extensive or highly technical." *Epic Games*, 67 F.4th at 983.

Furthermore, anticompetitive effects are not demonstrated by harm to potential claimants but to the market "as a whole." *See Am. Express*, 585 U.S. at 547; *see also Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012) ("Plaintiffs may not substitute allegations of injury to the claimants for allegations of injury to competition."); *Fourqurean v. NCAA*, 143 F.4th 859, 870 (7th Cir. 2025) (holding that the plaintiff could not rely "solely on his own exclusion from participating in college football as proof of anticompetitive effects"). Indeed, both Dr. Maxcy and Dr. Flyer agreed in their testimony at the hearing that the correct inquiry was whether the eligibility rule harmed the remaining labor market, not the excluded players.

Here, Plaintiffs have failed to provide either *direct* or *indirect* evidence of anticompetitive effects in the Division I college football market as a whole.

In his declaration, Dr. Maxcy outlines three anticompetitive effects: "output restriction, compensation suppression, and allocative distortion." Decl. of Maxcy ¶ 59. First, he argues that the eligibility rule "reduces the total quantity of labor available" and "therefore represents a net decrease in market output." *Id.* ¶ 60. Second, he argues that "reducing labor supply . . . weakens competition among buyers and depresses wages." *Id.* ¶ 61. Specifically, excluding fifth-year athletes—who are "most capable" of commanding higher compensation—"diminishes athletes' bargaining power and leads to compensation below competitive labor market levels." *Id.* ¶ 62. In other words, the eligibility rule "automatically removes [the] most expensive players from the market each year, creating an artificial ceiling on compensation that would not exist in a competitive market." *Id.* ¶ 64. Third, he argues that the "rules distort allocation" by "penalizing participation at non-NCAA institutions." *Id.* ¶ 65.

Additionally, at the hearing, Dr. Maxcy further characterized the eligibility rule as a "group boycott" that acts as a restraint on the supply curve. He also admitted the lack of relevant, publicly available data demonstrating current market harm. However, he did point to a ranking of the top one hundred NIL valuations of college athletes—in which upper classmen predominated—as some evidence that fifth-year Division I college football players are more highly compensated.[9]

In his declaration, Dr. Flyer rebuts all three of Dr. Maxcy's claims. *See* Decl. of Flyer ¶ 29. First, he argues that "the size of potential labor supply is not a measure of market output" and that Dr. Maxcy has not shown that "overall student-athlete labor market participation" has been reduced. *Id.* Second, he argues reducing the labor supply "should *increase* compensation, not decrease it" as a matter of supply and demand. *Id.* ¶ 30 (emphasis in original). Moreover, Dr. Maxcy has not shown that an excluded fifth-year athlete "who is eliminated by the eligibility rules would earn more in compensation than the athlete taking his spot." *Id.* ¶ 32. More importantly, even if these excluded players were more highly compensated on average, that does not necessarily lead to decreased compensation for the remaining players. *Id.* ¶¶ 33-34. Third, he argues that "Dr. Maxcy does not explain how participation at non-NCAA schools is relevant to this case." *Id.* ¶ 31.

Additionally, at the hearing, Dr. Flyer questioned Dr. Maxcy's reliance on the top one hundred NIL valuations to generalize the total population of Division I college football players.

[9]Dr. Maxcy testified that a separate ranking existed for solely football players, but that is incorrect. As of November 20, 2026, fifty-two of the hundred athletes on the list were college football players. Seventeen were seniors (including six redshirts), twenty-one were juniors (including seven redshirts), six were sophomores (including two redshirts), six were freshmen (including one redshirt), and two were incoming 2027 freshmen. *On3 NIL Valuations*, ON3 (Nov. 20, 2026), https://www.on3.com/nil/rankings/player/nil-valuations/ [https://perma.cc/JH3Q-WPUG]. Dr. Maxcy did not reference this ranking as a source of empirical data in his report. *See* Decl. of Maxcy. Regardless, the ranking is of limited value to support his claim that fifth-year athletes are the highest earners in the Division I college football market. It does not demonstrate that a reduction of that group will suppress compensation across the whole labor market.

The Court will address each of Dr. Maxcy's claims in turn.

1.
Output Restriction

The Court finds that Plaintiffs have failed to demonstrate that the eligibility rule results in output restriction in the current labor market. Dr. Maxcy has failed to provide any direct evidence of decreased output or increased unemployment.

Dr. Maxcy has also failed to provide any indirect evidence, including a *coherent* theory for how the eligibility rule *specifically* decreases output or increases unemployment. *See Robinson*, 172 F.4th at 292-93 n. 12 (requiring a "coherent" theory); *Spanish Broad. Sys.*, 376 F.3d at 1073 (requiring a "specific" allegation). The Court acknowledges that a reduced labor supply *can* result in increased unemployment. However, Dr. Maxcy does not provide for any such mechanism here. Moreover, Dr. Maxcy does not address the role that limited roster spots play in maintaining levels of employment. He anticipates NCAA's argument that "when one player's eligibility ends, a roster spot opens for a new player." Decl. of Maxcy ¶ 62. However, he does not provide any specific allegation or coherent theory to the contrary.

2.
Compensation Suppression

The Court also finds that Plaintiffs have failed to demonstrate that the eligibility rule results in compensation suppression in the current labor market.

Dr. Maxcy has failed to provide any direct evidence of decreased wages. Indeed, the only empirical evidence that Dr. Maxcy has provided is a ranking of the top one hundred NIL valuations of college athletes. *See supra* note 9. However, this data fails to support the generalization that fifth-year athletes are the "most expensive players" or the "most capable of commanding higher . . . compensation[.]" Decl. of Maxcy ¶¶ 62, 64. More importantly, the data does not demonstrate

that excluding these athletes "leads to compensation below competitive labor market levels" or "create[es] an artificial ceiling on compensation[.]" *Id.*

Dr. Maxcy has also failed to provide sufficient indirect evidence. Here, Dr. Maxcy claims that the eligibility rule excludes "the most expensive" or "most capable of commanding higher . . . compensation" athletes, which in turn "leads to compensation below competitive labor market levels" and "create[es] an artificial ceiling on compensation" in the remaining labor market. Decl. of Maxcy ¶¶ 62, 64. The Court finds that Dr. Maxcy has identified a sufficiently *specific* mechanism for depressing compensation in the labor market. *See Spanish Broad. Sys.*, 376 F.3d at 1073 (requiring a "specific" allegation). However, the Court does not find this mechanism to be sufficiently *coherent*, especially where it contradicts ordinary principles of supply and demand. *See Robinson*, 172 F.4th at 292-93 n. 12 (requiring a "coherent" theory).

Both the Seventh and Ninth Circuits have recognized that "[u]nder ordinary principles of supply and demand, a restraint that limits the supply of workers in a labor market would increase, not decrease, worker compensation." *Fourqurean*, 143 F.4th at 871; *Blythe*, 190 F.4th at 867. Here, where Plaintiffs advance an economic theory that is an exception to that ordinary principle, Plaintiffs face a higher bar of substantiating their theory. Plaintiffs have provided no support for their assumption that fifth-year athletes are the most expensive or the most capable of commanding higher compensation. Indeed, the only empirical evidence that has been provided contradicts this assumption. *See supra* note 9.

In *Fourqurean*, the Seventh Circuit acknowledged the dissent's theory that "the Five-Year Rule depresses student-athlete compensation by pushing out the most experienced players." *Fourqurean*, 143 F.4th at 871. However, the Seventh Circuit could not "draw that conclusion"

given "the dearth of evidence" in the record. *Id.* Likewise, here, the Court cannot conclude that the eligibility rule leads to compensation suppression given the dearth of evidence in the record.

3.
Allocative Distortion

Finally, the Court finds that Plaintiffs' claim that the eligibility rule results in allocative distortion is irrelevant. Dr. Maxcy claims that the eligibility rule results in allocative distortion, because it "penalize[es] participation at non-NCAA institutions." Decl. of Maxcy ¶ 65. However, the relief sought by Plaintiffs' Motion to Reconsider is limited to Mr. Trotter and Mr. Lacey. *See* ECF Nos. 27-28. Both Mr. Trotter and Mr. Lacey played all four of their college football seasons at Division I programs. Decl. of Flyer ¶ 31. As such, the eligibility rule does not prevent Mr. Trotter and Mr. Lacey from playing on the basis of playing at non-NCAA institutions. Likewise, the Court cannot grant relief on that basis. *See* Compl. at 25 (praying that this Court restrain the NCAA from "enforcing NCAA Bylaw 12.6, or any other Bylaw, to preclude Plaintiffs from playing NCAA Division I athletics in the 2026-27 season on the basis that they have already competed in four seasons of competition").

4.
Procompetitive Rationale

As explained above, the Court does not find sufficient evidence of anticompetitive effects in the Division I college football labor market. As such, the Court does not reach Plaintiffs' remaining arguments as to procompetitive justifications. Thus, for the reason stated, the Court finds Plaintiffs are unlikely to succeed on the merits of their Sherman Act claim. Therefore, the Court also does not reach the remaining steps of the standard for a preliminary injunction.

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court **DENIES** Plaintiffs Dewaine Boogie Trotter and Demarcus Lacey's Motion for Reconsideration of the Court's Order Denying Preliminary Injunction, or in the Alternative, Renewed Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 27) and their Motion for Clarification Regarding Scope of Requested Injunctive Relief. ECF No. 42.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: November 23, 2026

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE